UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

WILLIAM TUER and
CINDY FRALEY,

    Plaintiffs,

v.         CASE No. 8:03-CV-1407-T-17TGW

MIA'S RESTAURANT
ASSOCIATES, INC., d/b/a MIA'S,

    Defendant.

_____

## REPORT AND RECOMMENDATION

    This is an action alleging sexual harassment and employment discrimination under Title VII, 42 U.S.C. 2000 et. seq., and the Florida Civil Rights Act, Fla. Stat., Ch. 760.01, et seq., retaliation under the Florida Whistleblower Act, Fla. Stat., §448.101 et. seq., and negligent retention. The defendant failed to defend this case, and a default was entered against it. Thereafter, a hearing was held to determine the amount of damages to which the plaintiffs are entitled. Based upon the evidence adduced at the hearing, I recommend that judgment be entered for plaintiff Cindy Fraley in the amount

of $55,840.02, and for plaintiff William Tuer in the amount of $34,875.44, plus the addition of pre-judgment interest on their back pay awards.

## I.

The plaintiffs in this case are William Tuer and Cindy Fraley. Fraley began her employment with a restaurant related to defendant Mia's Restaurant Associates, Inc., in October 2000 in Fort Myers.[1]  She also worked at another company-related restaurant in Naples.  In approximately December 2001, Fraley voluntarily transferred to Mia's, which was located in Hyde Park in Tampa, and worked there as a waitress.  Tuer began working as a waiter at Mia's in December 2001.[2]  As noted, Jim and Bettie Hall own Mia's.[3]

Fraley alleges that, throughout her employment at Mia's, she was subjected to sexual harassment because of her gender.  Tuer alleges that he was subjected to employment discrimination because of his gender and that

---

[1]According to the plaintiffs, the owners, Jim and Bettie Hall, owned various restaurants, including Mia's.

[2]Tuer testified that, prior to Mia's, he worked at a different restaurant in Naples at which he would wait on Jim and Bettie Hall when they dined there.  He also, at times, worked as a private server at their home in Naples.

[3]Apparently Mia's has closed.  Plaintiffs' counsel indicated at the hearing that, the last time he checked, it is still an active corporation.

he was discharged in retaliation for complaining to the owners about various illegal activities occurring at Mia's.

More specifically, Fraley testified that, routinely, she was subjected to unwelcome sexual advances by Mia's manager, Damian Fasce. According to Fraley, every day or every other day, from the beginning to the end of her shift, Fasce would verbally harass her by sexually propositioning her or making sexually suggestive comments. Fasce's commentary would range from "you look hot," "you look great, but let's see what's underneath that" to inviting her out for a drink or dinner. Fasce also would sexually proposition Fraley by requesting her to come over to his place to give him a massage with added commentary that she could take care of his needs and vice versa.[4]

Fraley testified further that Fasce made comments about her legs and her clothing. He invited her to clean his place while wearing little clothing or a bikini or a thong. He also suggested that they play wild teacher/librarian and made references about scheduling her then boyfriend (now fiancé), Tuer, on different days so that they could have some time alone together.

---

[4]Fraley is also a physical therapist.

Fasce also touched Fraley frequently. Fraley testified that Fasce's physical contact with her ranged from light touching to heavy groping. She explained Fasce would rub against her arms, look down her shirt, brush up against her buttocks, and graze her breasts. This frequently occurred when she was clearing a table or carrying something, so that she would not have time to react. Therefore, due to Fasce's behavior, Fraley became very conscious when she was squatting or turning at work.

Fraley testified that her work schedule was also negatively affected. Fasce would make his advances before the employees' weekly schedule was announced. When Fraley did not agree to his terms or his advances, she received less shifts or was placed in a less favorable section of the restaurant. In contrast, Fasce gave preferential treatment to the female servers that accepted his advances.

On one particular occasion, Fasce pulled Fraley into him and pressed his groin into her, wiggled and pressed until she could push him away.[5] Fraley complained to her immediate supervisor and was told "well, we

_____

[5]According to her statement to the Equal Employment Opportunity Commission ("EEOC"), Fasce stepped away from her after looking into her eyes (Doc. 31, Ex. 4, p. 1).

know how Damian is."[6]  She subsequently went to a different manager and was told "I think you're overreacting.  I don't consider that a lot."  Fraley also complained to the assistant manager and was told that there was nothing that he could do about the matter.  Thus, Fraley went to various management levels, including the head kitchen manager, but no corrective action was taken.  She asserts that Mia's did not have a procedure for sexual harassment complaints or training.

Fraley compared her situation with other female workers at Mia's and learned that there were numerous complaints about Fasce's behavior.  Consequently, a group of employees, which included female servers, two male bartenders and three to four male servers, had a meeting that took place outside of Mia's.  The group decided to complain to the Halls.  Fraley asked for a meeting with the Halls.  When nothing happened, Tuer was asked to approach the Halls on the group's behalf since the Halls had previously asked him to be their "eyes and ears" at the restaurant.  Fraley testified that she began complaining about Fasce in July 2002, but the meeting between the Halls and Tuer did not occur until October 2002.

---

[6]According to her statement to the EEOC, the manager, named Larry, stated "[t]hat's horrible, we'll have to talk about this.  You know how Mr. Fasce is though" (Doc. 31, Ex. 4, p. 2).

Fraley and Tuer testified to instances of a mud-ball being thrown at their apartment window and of Fraley being mugged while she was running. However, there is no evidence that these events relate to their complaints against Mia's.

Fraley testified that she experienced emotional and physical problems as a result of Fasce's harassment.[7]  At the time of the harassment, she was stressed, not eating, not sleeping, had headaches, and was constantly feeling sick.  Fraley explained that she was adversely affected at the Bank of America, her other place of employment.  At the Bank of America, she did not know how to handle herself around males to the point that she requested to work with a female manager.  She stated that her work there slipped.

As a result of her problems, she has received counseling from her sister, who is a clinical psychologist.  She has also received counseling at the Bank of America, and has used that company's online support system.

Fraley stated that she continues to have problems.  She still suffers from bad dreams, at times is edgy around other male co-workers and

---

[7]Fraley also testified that, approximately six months ago, on one occasion Fasce showed up at her place of employment (a restaurant) and that she was so upset that she had to be escorted to her car.  She explained she looks around to ensure that he is not lurking somewhere nearby.

tends not to make friends easily or to get close to people. Moreover, she is hesitant to expand her friendships at work, and this has negatively affected her ability for a promotion, as she believes she is not regarded as a company person.

Tuer, Fraley's fiancé, supported Fraley's testimony. He said that she does not like to be alone, she is uneasy, and she tosses and turns a lot more during the night.

Tuer testified that he witnessed Fasce's harassment and his preferential treatment towards female servers. However, he said he never saw Fasce do anything to Fraley, but instead would see Fasce whisper into Fraley's ear.

He testified that one female server, in particular, who accepted Fasce's advances would often receive in her section the customers that were known to tip well. Moreover, her section of the restaurant would be filled with customers, while other servers only had one or two tables filled. The same was true of another female server who accepted Fasce's advances. According to Tuer, Fasce, in general, would place more customers and the well-known tippers in the sections of the female servers that accepted his

advances, rather than place those customers in the male waiters' sections or in the sections of the female servers that rebuffed his advances.

Tuer stated that the Halls hired a female greeter to alleviate the problem, but that only made the situation worse. Fasce would "hit on" the greeter. That greeter accepted his advances and, consequently, listened to Fasce on where to seat the incoming customers.

Tuer approached Fasce about Fraley's complaints, but was told that he did not remember any of it. Tuer then addressed the matter with the management team, including the chef. Nothing was done. Consequently, after speaking with the female servers, he called the Halls in the last week of October to request a meeting.

The meeting took place on Friday of that same week. At the meeting, Tuer informed the Halls of the female servers' situation with Fasce. The Halls responded that they would investigate the sexual harassment. Tuer also discussed problems relating to drugs, underage drinking and Fasce stealing glasses and wine bottles from Mia's. Apparently, Fasce was reprimanded the next day, which was Saturday. Tuer did not work on Sunday, and Fasce discharged Tuer on Monday, November 4, 2002. Afterwards, Tuer never heard from the Halls, despite his attempts to contact them.

Tuer said he also suffered emotional problems. He explained he had overall stress from knowing Fraley was at work (with Fasce). He worried about how to pay the bills after he was fired. His school work was affected and he failed a course at the University of South Florida.

After Tuer was discharged, Fraley continued working at Mia's. Fraley testified that, after Tuer's meeting with the Halls, Fasce was on good behavior and the harassment stopped. However, that behavior only lasted for about three or four days to a week and a half. He then continued with the unwelcome physical contact and the inappropriate comments directed towards Fraley. He did not lose his job and was not even suspended.

Fraley testified that it was too hard to work with Fasce. The situation was negatively affecting her work, and her interaction with others at work. Fraley testified that she would drop glasses and nick her finger while she was cutting bread. She decided to quit Mia's, rather than be fired, after filing her complaint with the Equal Employment Opportunity Commission ("EEOC").

On December 5, 2002, Tuer and Fraley both filed a charge of discrimination with the EEOC and the Florida Commission on Human

Relations (Doc. 31, Exs. 1, 2).  On March 13, 2003, the EEOC issued a right-to-sue letter to both plaintiffs (Doc. 2, Exs. A, B).

Subsequently, the plaintiffs filed a joint seven-count complaint in Hillsborough County Circuit Court, alleging sexual harassment and employment discrimination in violation of Title VII (Counts I, IV) and the Florida Civil Rights Act (Counts II, V) (Doc. 2).  The complaint also includes claims of negligent retention (Counts III, VII) and  retaliation under Florida's Whistleblower statute (Count VI).[8]   On July 3, 2003, Mia's removed the case to this court (Doc. 1) and filed an answer to the complaint (Doc. 3).

Thereafter, on May 4, 2004, Mia's attorneys filed a motion to withdraw their representation (Doc. 15).  On May 7, 2004, United States District Judge Elizabeth A. Kovachevich entered an Order deferring that motion and staying the case for twenty days to permit Mia's to obtain new counsel (Doc. 16).  Subsequently, on June 21, 2004, an Order was entered warning that, if Mia's did  not retain counsel and have a notice of appearance filed within ten days, a default judgment would be entered (Doc. 17).  Mia's former counsel filed a motion on June 28, 2004, requesting clarification

---

[8]The complaint incorrectly denotes Count IV as Count VI, and Count V as Count II (Doc. 2, pp. 8, 9).

whether their motion to withdraw had been granted and asking for Mia's to be given an additional ten days to obtain new counsel (Doc. 18).  On July 12, 2004, an Order was entered granting the motion to withdraw and giving Mia's an additional ten days to obtain counsel (Doc. 19).  That Order warned that, after ten days, the court would assume that the defendant was abandoning its case and a default judgment would be entered (id.).  Mia's former counsel were directed to give a copy of the Order to Mia's (id.).  No appearance was subsequently filed.  Consequently, on August 20, 2004, the plaintiffs filed a motion for the entry of a default judgment (Doc. 21).  On September 10, 2004, the motion was granted, and a default judgment was entered as to liability (Doc. 22).   The matter was then referred to me for a report and recommendation concerning the amount of damages (Doc. 25).  Accordingly, an evidentiary hearing was held to hear testimony and consider evidence supporting the plaintiffs' damage claims (Doc. 30).

## II.

The plaintiffs seek an award of back pay with pre-judgment interest, non-economic compensatory damages and punitive damages.[9]  At the

---

[9]In their complaint, the plaintiffs request front pay and injunctive relief (Doc. 2, pp. 5, 6, 7, 8, 9, 10, 11, 12).  The plaintiffs did not request front pay either in their Statement of Damages or in their schedule of lost wages (see Doc. 24; Doc. 31, Ex. 8).  At the hearing,

hearing, plaintiffs' counsel indicated that the plaintiffs wish to pursue their remedies under the Florida Civil Rights Act ("FCRA") because, unlike federal law, it has no limitation on recovery for compensatory damages.   The plaintiffs also request damages under their claims of negligent retention and under Tuer's claim pursuant to Florida's Whistleblower Act.  The plaintiffs, of course, are not entitled to double recovery in an award of damages.  Thus, if a plaintiff recovers an element of damages under one theory of liability, he or she is not entitled to recover for that same element of damages under a different theory of liability.  Westerman v. Sears, Roebuck and Co., 577 F.2d 873, 879 (5th Cir. 1978).

A. Back pay is a standard element of damages for employment discrimination.  Fla. Stat., §760.11(5).[10]   Here, both plaintiffs seek as back pay the difference between their actual earnings and the amount they allege

---

plaintiffs' counsel only discussed back pay and indicated that he was not seeking future wages.  Moreover, because Mia's is no longer in operation, the issue of injunctive relief is moot.  Accordingly, both of those previous requests for relief should be deemed abandoned.

After a monetary judgment is entered, plaintiffs' counsel plans to submit a statement for an award of an attorney's fee and costs (Doc. 24, p. 3).

[10]Title VII cases are useful in analyzing claims under the FCRA because the FCRA was modeled after Title VII.  See Harper v. Blockbuster Entertainment Corp., 139 F.3d 1385, 1387 (11th Cir. 1998), cert. denied, 525 U.S. 1000 (1998).  Accordingly, Title VII cases are appropriately considered in assessing recovery under the FCRA.

they would have earned had the defendant not engaged in discriminatory employment practices.[11]  Their claim for back pay has two aspects.

First, the plaintiffs seek lost wages for their alleged discrimination in not receiving as many customers at Mia's or not as good a schedule as those female servers who accepted Fasce's advances.  The problem with this claim is that the plaintiffs have compared their salaries from Mia's to Fraley's previous place of employment at Bistro 41 (which is located in Fort Myers), instead of comparing their wages to the wages of the female servers at Mia's that accepted Fasce's advances.  The plaintiffs adduced no evidence showing the amount of money that the other female servers earned at Mia's or the extent of the disparity between the pay.

Moreover, there was no evidence presented establishing that Bistro 41 is a comparable restaurant to Mia's in terms of compensation for the wait staff.  Thus, factors that impact a server's tips, such as the menu, pricing and customer clientele are unknown both for Bistro 41 and for Mia's.  Accordingly, it is pure speculation that the plaintiffs would have earned the

---

[11]In support of their claims, the plaintiffs have submitted a proposed back pay schedule and copies of their W-2 forms for the years of 2001 and 2002 (Doc. 31, Exs. 5, 6, 8).

same compensation at Mia's that Fraley had earned at Bistro 41, and that is especially true as to Tuer.

Fraley and Tuer also compute their lost wages by multiplying their average monthly salary from Mia's by the number of months that it took them to find comparable employment (Doc. 31, Ex. 8).[12] Fraley claims it took her five months to find comparable employment at a restaurant (Doc. 31, Ex. 8), while Tuer testified it took him nine months to find a comparable job. Fraley explained it required a long time because she was trying to find the same income level that she received at Mia's and also a restaurant in which a female held a management position. Similarly, Tuer testified that it was difficult for him to find a restaurant comparable to Mia's in which he could work part time, and he named a few high-end restaurants at which he applied.[13] He explained that it was hard to find a restaurant that would hire him to work only on the weekends because, generally, servers graduate to that

---

[12]Fraley incorrectly calculates her lost wages. The amount of $14,016.14 divided by twelve and multiplied by five equals (as rounded off) $5,840.02, and not $8,400, as the plaintiff states (see Doc. 31, Ex. 8).

[13]Tuer was attending USF at the time and, thus, could only work part-time and mainly on the weekends.

level or a server must prove himself first before being allowed to work that type of schedule.

The length of time that it took the plaintiffs to find restaurant work plainly raises the issue of mitigation of damages. However, lack of mitigation is an affirmative defense that an employer asserts to discredit a plaintiff's claim of lost wages. Munoz v. Oceanside Resorts, Inc., 223 F.3d 1340, 1347 (11th Cir. 2000). Thus, it is the employer's burden to demonstrate that the plaintiff was not reasonably diligent in finding comparable work. Lathem v. Department of Children and Youth Services, 172 F.3d 786, 794 (11th Cir. 1999). Here, of course, in light of the default, the defendant has not attempted to demonstrate that the plaintiffs did not use reasonable diligence in finding other work.

Consequently, while five months appears to be a lengthy amount of time for Fraley to find a job, there is no evidence that she was not reasonably diligent. Accordingly, she should be awarded back pay for the five months she was seeking employment. This entitles Fraley to $5,840.02 in back pay, which is calculated by dividing her annual compensation of $14,016.04 by twelve and multiplying by five.

With respect to Tuer, nine months appears to be an unreasonable amount of time to find work. However, Tuer's testimony is uncontradicted that he was diligent in seeking other employment. Therefore, Tuer should be granted nine months in back pay. <u>Munoz</u> v. <u>Oceanside Resorts, Inc.</u>, <u>supra</u>, 223 F.3d at 1347-48 (sufficient mitigation where, upon questioning, plaintiff claimed he consistently pursued employment during four-year period). Nine months of back pay for Tuer amounts to $9,875.44, which is calculated by dividing his compensation of $12,618.62 by his employment period of eleven and one-half months and multiplying by nine (<u>see</u> Doc. 31, Ex. 8).[14]

Each plaintiff also requests pre-judgment interest in the amount of $2,500 (Doc. 24). However, the plaintiffs have not shown how this figure was computed. Moreover, this amount, no matter how it was calculated, was based on their original damage requests, which have not been fully accepted. Consequently, the amount of pre-judgment interest claimed by the plaintiffs should be rejected. Rather, in response to this report and recommendation, the plaintiffs can submit their computations of pre-judgment interest.

---

[14]The plaintiffs' submission calculated back pay for Tuer of ten months (<u>see</u> Doc. 31, Ex. 8). However, his testimony was that it took him nine months to find comparable work.

B. Under Florida law, non-economic compensatory damages are available to victims of intentional discrimination.   Fla. Stat., §760.11(5). Florida law states that compensatory damages may be awarded for "mental anguish, loss of dignity, and any other intangible injuries."  Id.  Unlike federal law, there is no limitation on the amount of compensatory damages awardable under the FCRA.

Fraley testified that, as a result of Fasce's sexual harassment, she has suffered stress, lack of appetite, insomnia, headaches, and a constant sick feeling.  She was also impaired in her ability to make friends, in working with males at her other place of employment, and in obtaining promotions.  Fraley has requested non-economic damages in the amount of $100,000.   That amount is clearly excessive.  The fact that the defendant has defaulted does not mean that it should be mulcted.

The  evidence  of  sexual  harassment  was not particularly compelling. The undisputed evidence demonstrates that Fasce made comments with sexual overtones and engaged in unwelcome touching.  However, Fasce's compliments about Fraley's appearances, such as she "look[ed] hot" or "look[ed] great," do not amount to sexual harassment.   See Gupta v. Florida Board of Regents, 212 F.3d 571, 584 (11th Cir. 2000), cert. denied, 531 U.S.

1076 (2001) ("[a] man can compliment a woman's looks ... on one or several occasions, by telling her that she is looking 'very beautiful,' or words to that effect, without fear of being found guilty of sexual harassment for having done so").  Fasce's invitations to take Fraley out for a drink or dinner do not amount to sexual harassment.  See id. at 585 (plaintiff could not establish hostile environment where, amongst other things, she was asked out to lunch).  Consequently, many of Fasce's comments appear to have been flirtations and "flirtation is not sexual harassment."  See id. at 584.

However, Fasce's commentary with regards to sex games and his constant grazing on Fraley was offensive and affected her work at Mia's.  Fasce's act of pushing his groin into Fraley was clearly unacceptable and Fraley's complaints to management went without correction.   Thus, Fraley is entitled to significant compensation for suffering this behavior.

However, although Fraley obtained some counseling, she did not seek formal counseling, which suggests that her mental anguish is not as severe as she claims.  Her testimony appeared exaggerated to some degree, especially her testimony that she has trouble working with males and has been hampered in advancing her career.

Notably, Fraley testified that she was mugged while running and had a mudball thrown at her apartment. There is no evidence connecting the defendant with those incidents and, thus, Mia's cannot be required to provide compensation for them.

Further, it is reasonable to think that the mugging was far more traumatic than Fasce's conduct. Consequently, the emotional distress that Fraley alleges most likely came more from the mugging than from Fasce's behavior.

Under these circumstances, it seems to me that Fasce's conduct was not severe enough to justify an award of $100,000 in compensatory damages. Rather, an award of $25,000 for Fraley's mental anguish and emotional distress would be reasonable.

Because of the difference in fact patterns in this type of fact-intensive case, a comparison of damage awards in other cases is not particularly enlightening. Nevertheless, a number of cases have been collected which show that an award to Fraley of $25,000 is reasonable and appropriate.[15] See Gentry v. Export Packaging Co., 238 F.3d 842 (7th Cir.

_____

[15]It should be noted that the plaintiffs attached various verdict forms from other cases (Doc. 31, Exs. 7a-7i). However, those were not helpful because the details of those cases are unknown.

2001) ($10,000 in compensatory damages wherein over four-month period plaintiff received from supervisor forty hugs, fifteen shoulder rubs, a kiss on the cheek, two pecks on her cheeks and implicitly asked her for sex on a few occasions);  Kimbrough v. Loma Linda Development, Inc., 183 F.3d 782 (8th Cir. 1999) (affirming $50,000 award in compensatory and punitive damages to each plaintiff for plaintiff's embarrassment, humiliation, disgust, stress, affects on marriage and causing them to leave their jobs due to constant requests for sex, unwelcome groping and inappropriate comments); Howard v. Burns Bros., Inc., 149 F.3d 835 (8th Cir. 1998) (affirming jury award of $1,000 compensatory damages for plaintiff's mental anguish due to work experience including co-employee's sexual innuendos and often brushing up against her);  Davis v. Tri-State Mack Distributors, Inc., 981 F.2d 340 (8th Cir. 1992) ($7,643.68 compensatory damages awarded against company on state claim for outrageous conduct wherein manager made unwelcome sexual comments, would press up against plaintiff and had fondled her breasts, causing her physical and emotional stress); Equal Employment Opportunity Commission v. Fusaro Corp., 2000 WL 375256 (E.D. Pa. 2000) (awarding plaintiff Syron $30,000 compensatory damages for emotional pain due to supervisors unwelcome sexual advances including one instance of fondling

her and making her kiss him on cheek before permitting her to leave; awarding plaintiff Kross $12,000 compensatory damages for mental anguish caused by supervisor's offensive sexual comments including one instance of kissing her on neck and having her kiss him before allowing her to leave); Steinhoff v. Upriver Restaurant Joint Venture, 117 F.Supp.2d 598, 601-03 (E.D. Ky. 2000) (affirming $25,000 compensatory damages award for restaurant's manager's sexual harassment of plaintiff consisting of sexual comments and on one occasion, "he put his hand in her shorts, pulled out her pantyhose, and looked down into them" causing her continual distress); Nuri v. PRC, Inc., 13 F.Supp.2d 1296 (M.D. Ala. 1998) (stating jury awarded $10,000 compensatory damages to plaintiff against company for sexual harassment claim wherein supervisor requested plaintiff for oral sex, made other suggestive comments and one time placed his head on her breasts); Troutt v. Charcoal Steak House, Inc., 835 F.Supp. 899 (W.D. Va. 1993) (under state claim for sexual assault and battery, $10,000 compensatory damages for waitress' shame, humiliation and embarrassment due to supervisor's constant touching including grabbing her buttocks, putting his hands on her; on one occasion placed his hand on her breast and at least once placed his hand on her groin area underneath her skirt).

Tuer claims $100,000 in non-economic damages.[16]  In support of this claim, he testified that he was worried about not being able to pay the bills and that he was fearful for Fraley to be unaccompanied.  He said he had overall stress from their situation and knowing Fraley still worked at Mia's with Fasce.  Tuer testified that, during the ordeal, he failed a college course, apparently in physics.

It appears that a major part of Tuer's emotional distress allegedly stems from Fraley's sexual harassment rather than his own improper treatment at Mia's.  Thus, he did not testify to any mental anguish arising from being treated differently than the female waitresses at Mia's.  Rather, his concerns centered around his worry for Fraley and their apartment bills.  Tuer, however, has not pointed to any authority indicating that he is entitled to recover damages because it bothered him to see his girlfriend sexually harassed.

On the other hand, Tuer did suffer some emotional distress from being fired for complaining to the owners about the sexual harassment (as well as other problems at the restaurant).  But being improperly terminated from a part-time job at a restaurant certainly does not justify an award for

---

[16]Originally, Tuer requested compensatory damages of $50,000 under Title VII and $50,000 under the FCRA.  At the hearing, counsel indicated Tuer was seeking $100,000 under the FCRA.

emotional distress of $100,000.  It is not as if Tuer was fired from his life's

vocation, or even a career opportunity.  Rather, it was simply a job he held to

help pay his way through college.   Moreover, if Tuer's financial

circumstances were as distressing as he says, it is reasonable to think that it

would not have taken him nine months to obtain another job.

Further, it is doubtful that his failing of one college course was

a result of his experience at Mia's, rather than it simply being a difficult

course.  If his schoolwork were truly affected by his work experience at Mia's,

all of his classes would seemingly suffer as a consequence and not just his

physics course.

It appears appropriate to me to set Tuer's damages for emotional

distress at one-half of that awarded Fraley.  Accordingly, I recommend that

he be awarded $12,500 for that element of damage.

C.  Under the Florida Civil Rights Act, a plaintiff may also be

awarded punitive damages in certain circumstances.  Fla. Stat., §760.11(5).

Florida law limits such an award to $100,000.  Id.  On this element, each

plaintiff seeks an award of $100,000.[17]

---

[17]Originally, Fraley sought $1,000,000 and Tuer $200,000 in punitive damages.
(Doc. 24, p. 2).  At the hearing, plaintiffs' counsel indicated that the plaintiffs  were each
seeking $100,000.  Accordingly, the prior amounts are considered abandoned and I am
only considering those amounts mentioned at the hearing.

Fraley is entitled to some punitive damages. Her complaints about the harassment to various Mia's managers went uncorrected. After Tuer complained to the Halls, Fraley testified that Fasce's inappropriate behavior stopped for a brief period of time, but then started again. Thus, Mia's, although it was aware of the sexual harassment, did not address adequately Fraley's (and other employees') complaints about Fasce. Consequently, Fraley's work became impaired and she ended up quitting her job at Mia's.

However, Fraley's request for $100,000 in punitive damages is overstated. As previously discussed, her complaints mainly consist of Fasce's sexual commentary, his grazing against her body and the single incident of pushing his groin into her. While Fraley endured some sexual harassment, that harassment does not justify the maximum award of punitive damages.

Moreover, not all of Fasce's comments to Fraley consisted of sexual harassment, but were instead flirtations. Therefore, Fraley's claimed sexual harassment does not appear to be as pervasive or as frequent as suggested. Furthermore, her emotional distress does not appear to be as severe as seen in other cases and seems exaggerated to some degree.

However, she is entitled to recover some punitive damages for the stress she endured as a result of the harassment of the unwelcome

touching, the sexual innuendos and the single groin incident. It appears appropriate to award punitive damages in an amount equal to that awarded for her emotional distress.  I therefore recommend that Fraley be awarded $25,000 in punitive damages for the sexual harassment.

Tuer is also entitled to punitive damages.  The uncontradicted evidence demonstrates that Fasce fired Tuer the Monday following his complaints to the Halls about certain illegal activity occurring at Mia's, including sexual harassment and sexual discrimination.  It is plainly unlawful to fire an employee for making such complaints.  A termination for that reason warrants some punishment.

It appears to me that an appropriate punishment is an amount equal to the emotional distress damages awarded to Tuer.  Consequently, I recommend that Tuer be awarded punitive damages of $12,500.

### III.

In sum, Fraley is entitled to awards of $5,840.02 in back pay, $25,000 for mental anguish, and $25,000 in punitive damages, for a total of $55,840.02.  Tuer is entitled to awards of $9,875.44 in back pay, $12,500 for mental anguish, and $12,500 in punitive damages, for a total of $34,875.44. The plaintiffs are also entitled to an award of pre-judgment interest on their

back pay.  In response to this report and recommendation, the plaintiffs can submit their calculation of that interest.[18]

The Clerk is directed to send a copy of this report and recommendation to the defendant.


Respectfully submitted,


THOMAS G. WILSON
UNITED STATES MAGISTRATE JUDGE


DATED: NOVEMBER 28, 2005


## NOTICE TO PARTIES

Failure to file written objections to the proposed findings and recommendations contained in this report within ten days from the date of its service shall bar an aggrieved party from attacking the factual findings on appeal.  28 U.S.C. 636(b)(1).

---

[18]These damages are awarded pursuant to the FCRA, rather than Title VII, in accordance with the plaintiffs' election.  The plaintiffs also have claims under the Florida Whistleblower's Act, §448.103, Fla. Stat., and under state common law for negligent retention.  The amounts awarded fully compensate the plaintiffs for each element of their damages, and, thus, no further damages are appropriate under these two additional claims.